UNITED STATES DISTRICT COURT
SOUTH DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| **CHARLOTTE SALINERO and** | ) | **Civil Action No.: 1:18-cv-23643-UU** |
| **EFRAIN SALINERO, her husband,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **JOHNSON & JOHNSON and** | ) | |
| **ETHICON, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, Charlotte Salinero and Efrain Salinero, M.D. ("Plaintiffs"), by and through undersigned counsel, and bring this action against Defendants Ethicon, Inc. and Johnson & Johnson (hereinafter "Defendants"), and alleges as follows:

### PARTIES

#### A.  Plaintiffs

1.     Plaintiff, Charlotte Salinero, a woman who had Defendants' Artisyn Mesh (defined below) inserted in her body and has suffered injuries as a direct result of same.

2.     Plaintiff, Dr. Efrain Salinero, is the spouse and intimate partner of Plaintiff Charlotte Salinero.

#### B.  Defendants

3.     Defendant, Johnson & Johnson ("J&J") is a corporation, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its worldwide headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Johnson &

1

Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its' pelvic floor repair products. Within J&J there are three sectors, medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the pelvic floor repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD.

4.     Defendant, Ethicon, Inc., is a wholly owned subsidiary of Defendant Johnson & Johnson located in Somerville, New Jersey.

5.     Defendant, Ethicon, LLC, is a wholly owned subsidiary of Johnson & Johnson Medical, Inc., located in San Lorenzo, Puerto Rico. Ethicon LLC was charged by J&J with the manufacture of Ethicon Inc.'s pelvic floor repair products.

6.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including but not limited to, Mesh Artisyn Y Shaped 27 CM X 5 CM JJ ETHI ARTY (LOT #EG8CZZZ0/Item # 673260) ("Artisyn Mesh").

7.     Defendants manufacture, market, advertise, promote and sell Artisyn Mesh worldwide. As a result of the coordinated activities of all Defendants named above, Plaintiff Charlotte Salinero was implanted with a defective vaginal prolapse repair product and suffered severe permanent damages.

8.    Defendants had a legal duty to insure the safety and effectiveness of their Artisyn Mesh by conducting adequate and well controlled studies on their products prior to marketing.

9.    Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their Artisyn Mesh.

10.    Defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their Artisyn Mesh.

11.    Defendants are liable to Plaintiffs for damages suffered by Plaintiff Charlotte Salinero arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its defective Artisyn Mesh.

### JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiffs and all Defendants. The amount in controversy exceeds $75,000.

13.    This Court has personal jurisdiction over each of the Defendants pursuant to the Florida Long-Arm Statute, § 48.193. Defendants transact business within the State of Florida, and Defendants committed tortious acts and omissions in Florida. Defendants' tortious acts and omissions caused injury to Plaintiff in the State of Florida. Defendants have purposefully engaged in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest, or other related entities, medical devices including Artisyn Mesh in Florida, for which they derived significant and regular income. The Defendants reasonably expected that that their defective

Artisyn Mesh, including Artisyn, would be sold and implanted in Florida.

14.   Each of the above Defendants is either a foreign or domestic corporation that now conducts or has conducted significant revenue-producing business in Florida. Defendants have derived substantial revenue from intrastate and interstate commerce and could reasonably expect their sale and distribution of Artisyn Mesh to have consequences in Florida.

15.   Defendants commercial activities in Florida were not isolated and Defendants have maintained sufficient contacts with Florida and/or transacted substantial revenue-producing business in Florida to subject them to the jurisdiction of this Court pursuant to Florida Statute § 48.181, 48.182, and 48.193.

16.   The above-named Defendants have, at all times material to this cause of action, through their agents, officers and representatives, operated, conducted, engaged in and carried on a business venture in Florida; maintained an office or agency in this state; solicited business or provided service activities within this state, and/or committed a tortious act within the state by manufacturing, selling and disseminating to the public inherently dangerous products: 1) without testing said products to determine their harmful effects on persons coming in contact with said products; and 2) by failing to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Plaintiff, Plaintiff's treaters, of the risks, dangers and harm resulting from the ordinary and foreseeable use of the Artisyn Mesh.

17.   Defendants' tortious conduct, including but not limited to failure to warn and/or the manufacture, sale and/or distribution of defective products, is continuing and presently existing; arose from Defendants acts and/or omissions which occurred inside and outside of Florida during the relevant period; and proximately caused Plaintiffs' present injuries.

18.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

4

## PLAINTIFF'S IMPLANT AND EXPLANT OF ARTISYMN MESH

19.   On December 3, 2012, Plaintiff Charlotte Salinero had surgery to correct a stage IV uterovaginal prolapse, during which an Artisyn Y Shaped Mesh, 27 CM X 5 CM JJ ETHI ARTY (LOT #EG8CZZZ0/Item # 673260) ("Artisyn Mesh") was implanted. Dr. Jaime L. Sepulveda-Toro, M.D. performed the robotic sacrocolpopexy at South Miami Hospital, in Miami, Florida.

20.   On April 24, 2017, Plaintiff Charlotte Salinero was forced to endure a lengthy surgery at South Miami Hospital to remove the implanted Artisyn Mesh, including pieces of the mesh that had eroded and traveled to the bladder, colon, and vagina. Specifically, Dr. Jaime Supelveda-Toro, Dr. Marcos Szomstein, and Dr. John A. Mekras (gynecologist, urologist, and colorectal surgeon) teamed to perform a low anterior resection with diverting loop ileostomy due to a rectovaginal fistula, which was caused by the Artisyn Mesh that was removed.

### DEFENDANTS' ARTISYN MESH

21.   Defendants manufacture, market and sell a mesh product known as Artisyn, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse.

22.   Artisyn was derived from a product known as Prolene Mesh, which was used in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. Prolene Mesh was derived from Defendants' Prolene mesh hernia product, and was and is utilized in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.

23.   On or about January 1, 2005, without seeking FDA clearance, the Defendants began to market and sell a product known as the Prolift System, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The ProliftSystem was and is offered as an anterior, posterior, or total repair system, and all references

to the Prolift and/or Prolift System include by reference all variations.

24.   On or about June 2011, Defendants began to market and sell Artisyn. The Artisyn was and is offered as for use as a bridging material for sacrocolposuspension/sacrocolpopexy where surgical treatment for vaginal vault prolapse is warranted.

25.   As stated above, the products known as Prolene Mesh, Prolift and/or Prolift, and Artisyn, are designed and sold for similar purposes, inclusive of the instruments and procedures for implantation, are collectively referenced herein as Defendants' "Artisyn Mesh" or the "Products".

26.   Defendants' Artisyn Mesh were designed, patented, manufactured, labeled, marketed, sold and distributed by the Defendants, at all times relevant herein.

## FACTUAL BACKGROUND

27.   Surgical meshes have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical Products designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). Manufacturers, including Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP an SUI. Today, defendants sell pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Products manufactured by Defendants are considered Class II medical devices.

28.   Defendants' meshes are targeted for women who suffer from pelvic organ prolapse and stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while correcting vaginal prolapse, stress urinary incontinence, pelvic organ prolapse.

29.   Moreover, these Artisyn Mesh contain polypropylene mesh.

30.   Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' products, including, Artisyn Mesh. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to the formation of severe adverse reactions to the mesh.

31.   At various times, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market the Artisyn Mesh under Section 510(k) of the Medical Device Amendment. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendants to prove the safety or efficacy of the Artisyn Mesh and, thus, a formal review of the safety and efficacy of the Artisyn Mesh was never conducted.

32.   Defendants' Artisyn Mesh has been and continues to be marketed to the medical community and directly to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse, and as safer and more effective as  compared to the traditional products and procedures for treatment, and other competing meshes.

33.   The Defendants have marketed and sold the Artisyn Mesh to the medical community at large and directly to patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable cash and non-cash benefits to health care providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety

7

and utility of the Artisyn Mesh. Defendants' further engaged in direct-to-consumer marketing specifically designed to drive consumers to seek out these products for implantation into their bodies.

34.   At all times relevant to this action, Defendants recklessly and/or negligently concealed, suppressed, omitted, and communicated the risks, dangers, defects, and disadvantages of the Artisyn Mesh and advertised, promoted, marketed, sold and distributed the Artisyn Mesh as a safe medical device when, in fact, Defendants knew that the Artisyn Mesh were not safe for their intended purposes and that the Artisyn Mesh would cause, and did cause, serious medical problems, and in some patients, catastrophic and permanent injuries.

35.   For example, Defendants described in its Patient Brochures, Instructions for Use, and other marketing materials, that the known complications for its Artisyn Mesh were consistent with any surgical procedure of an implantable medical device and described such occurrences as "rare" and "small" when in fact Defendants knew or should have known that the complications were not "rare nor small" but common, permanent, and debilitating.

36.   Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Artisyn Mesh have high malfunction, failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law. The Products' defects include, but are not limited to, the following:

> a.  the use of polypropylene material in the mesh itself and the immune reaction that results, causing adverse reactions and injuries;
>
> b.  the design of the Artisyn Mesh to be inserted into an area of the body with high levels of bacteria, yeast, and fungus that adhere to the mesh causing immune

reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.  the procedure itself, which is a part of the Artisyn Mesh, requires to the physician to insert the device "blindly," resulting in nerve damage and damage to other internal organs;

d.  biomechanical issues with the design of the mesh that create strong amounts of friction between the Artisyn Mesh and the underlying tissue that subsequently cause that tissue to degrade resulting in injury;

e.  the lack of porosity in the mesh resulting in the formation of a scar plate that prohibits tissue in-growth, resulting in mesh contraction, nerve damage, pain, and erosion of the mesh into other organs, and failure of the device;

f.  the use and design of anchors in the Artisyn Mesh which when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

g.  degradation of the mesh itself over time which causes the internal tissue to degrade resulting in injury;

h.  particle loss and/or "shedding" of the mesh both during implantation and following implantation that results in additional undesirable complications including an increased inflammatory response and a migration of those particles resulting in injury;

i.  the welding and heating of the mesh itself during production which creates a toxic substance that contributes to the degradation of the mesh and host tissue alike;

j.  the design of trocars, as devices to insert the Artisyn Mesh into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries;

9

     k. the propensity of the mesh for "creep", or to gradually elongate and deform when subject to prolonged tension inside the body;

     l. the propensity of the mesh to contract, retract, and/or shrink inside the body;

     m. the inelasticity of the mesh, causing them to be improperly matted to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking); and

     n. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturer's instructions.

37.   Upon information and belief, the Defendants have consistently underreported and withheld information about the propensity of Defendants' products, including the Artisyn Mesh, to fail and cause injury and complications and have misrepresented the efficacy and safety of the Artisyn Mesh, through various means and media, misleading the FDA, the medical community, patients, and the public at large.

38.   Defendants have further deliberately chosen to forego conducting studies and registries to avoid reporting obligations that would be mandated under the federal regulations upon receipt of adverse event information.

39.   Despite the chronic underreporting of adverse events associated with the Defendants' Artisyn Mesh, the underreporting of events associated with similarly designed competitor products, and Defendants' deliberately avoiding the conduct of studies and registries to avoid the reporting of adverse events, eventually enough complaints were recorded for the FDA to issue a public health notification regarding the dangers of these devices.

40.   On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health

Notification that described over 1,000 complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to Artisyn Mesh. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendants are one of the manufacturers of the Artisyn Mesh that are the subject of the notification.

41.   On July 13, 2011, the FDA issued a Safety Communication:" UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of Pelvic Organ Prolapse was an area of "continuing serious concern." (emphasis added) The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of Pelvic Organ Prolapse, were "not rare."

42.   These serious complications include, but are not limited to neuromuscular problems, vaginal scarring/shrinkage, fistulas, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization.

43.   The FDA concluded in its Safety Communication that it was not clear that transvaginal repair of Pelvic Organ Prolapse with mesh or repair of SUI with mesh kits are more effective than traditional non-mesh repair of pelvic organ prolapse. Further, the FDA conducted a systematic review of the published scientific literature from 1996-2011 and concluded that based thereon, that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non-mesh repair." The FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development of new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible."

44.   The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13 2011, was known or knowable to Defendants and was not disclosed in oral or written communications, direct to consumer advertising in the form of patient brochures, instructions for use, or labeling.

45.   In fact, at the time Defendants began marketing the Artisyn Mesh, Defendants were aware that its Artisyn Mesh were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011 Safety Communication.

46.   In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

47.   Defendants knew or should have known about the Products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

48.   Defendants also knew or should have known that: (1) some of the predicate products for the Artisyn Mesh had high failure and complication rates, resulting in the recall of some of these predicate devices; (2) that there were and are differences between the Defendants' Artisyn Mesh and some or all of the predicate products, rendering them unsuitable for designation as predicate products; (3) that significant differences exist and existed between the Artisyn Mesh and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and (4) that the Artisyn Mesh were and are causing numerous patients severe injuries and complications.

49.   The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, and the patients. As a result, the Defendants misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the Artisyn Mesh and the procedures for implantation were and are safe and effective, leading to the prescription for and implantation of the Artisyn Mesh into Plaintiff.

50.   Defendants' Artisyn Mesh is defective due to Defendants' failure to adequately warn or instruct the Plaintiff and/or her health care providers of risks and complications including, but not limited to, the following:

     a.   the Products' propensities to contract, retract, and/or shrink inside the body;

     b.   the Products' propensities for degradation, fragmentation and/or creep;

     c.   the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

     d.   the Products' lack of porosity in preventing proper mating with the pelvic floor and vaginal region.

     e.   the rate and manner of mesh erosion or extrusion;

     f.   the risk of chronic inflammation resulting from the Products;

     g.   the risk of chronic infections resulting from the Products;

     h.   the risk of permanent vaginal or pelvic scarring as a result of the Products;

     i.   the risk of permanent vaginal shorting as a result of the Products;

     j.   the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

     k.   the need for corrective or revision surgery to adjust or remove the Products;

     l.   the severity of complications that could arise as a result of implantation of the

Products;

m.  the hazards associated with the Products;

n.  the Products' defects described herein;

o.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

p.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

q.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

r.  use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

s.  removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

t.  complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain; and

u.  the fact that neither pelvic organ prolapse, nor stress urinary incontinence, are life threatening conditions, and that other options, including non- surgical options, were available and superior alternatives to the use of the Products.

51.  Defendants also failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of their Artisyn Mesh.

52.  Defendants failed to design and establish a safe, effective procedure for removal of the Artisyn Mesh. Therefore, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Artisyn Mesh. Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation have existed at all times relevant as

14

compared to the Defendants' Artisyn Mesh

53.   The Artisyn Mesh were at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

54.   Furthermore, the Defendants provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the Artisyn Mesh, and thus increase the sales of the Artisyn Mesh, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff Charlotte Salinero.

55.   The Artisyn Mesh implanted into the Plaintiff Charlotte Salinero was in the same or substantially similar condition as they were when they left the possession of Defendants, and in the condition directed by and expected by the Defendants.

56.   Plaintiff and Plaintiff's physicians foreseeably used and implanted the Artisyn Mesh and did not misuse or alter the Artisyn mesh in an unforeseeable manner.

57.   The injuries, conditions, and complications for the Plaintiff who has been implanted with Defendants' Artisyn Mesh include, but are not limited to, mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), inability to engage in sexual relations, urinary problems, inability to void, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, shortening of the vagina, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence.

58.   Plaintiff was forced to undergo intensive medical treatment, including but not limited to, operations to locate and remove mesh, operations to attempt to repair, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina.

59.   The medical and scientific literature studying the effects of pelvic mesh, like Defendants'

15

Artisyn Mesh, have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often implicate errors related to the implantation of the devices.

60.   Defendants misrepresented to the medical and healthcare community, Plaintiffs, the FDA, and the public that the Artisyn Mesh had been tested and were found to be safe and effective for the purposes of treating incontinence and/or prolapse.

61.   Defendants misrepresented to the Plaintiff, to the Plaintiff's physicians, and to the medical community at large, that such product had been properly cleared for marketing by the FDA when in fact no such clearance had been sought or obtained. These representations were made by Defendants with the intent of inducing the medical community, Plaintiff, and the public, to recommend, prescribe, dispense, and purchase the Artisyn Mesh for use as a means of treatment for stress urinary incontinence and/or prolapse, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

62.   Defendants failed to undertake their duties to properly know the qualities of their Artisyn Mesh and in representations to Plaintiff and/or to Plaintiff's healthcare providers, and negligently omitted the following material information:

     a.   That the Artisyn Mesh was not as safe as other products and procedures available to treat incontinence and/or prolapse;

     b.   That the Artisyn Mesh was not as effective as other products and procedures available to treat incontinence and/or prolapsed;

     c.   That the risk of adverse events with the Artisyn Mesh was higher than with other products and procedures available to treat incontinence and/or prolapse;

     d.   That the risk of adverse events with the Artisyn Mesh was not adequately tested and were known by Defendants;

16

e. That the limited clinical testing revealed the Artisyn Mesh had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

f. That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

g. That Defendants were aware of dangers in the Artisyn Mesh in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

h. That the Artisyn Mesh was dangerous and caused adverse side effects, including but not limited to higher incidence of erosion and failure, at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

i. That patients needed to be monitored more regularly than usual while using the Artisyn Mesh and that in the event the Artisyn Mesh needed to be removed that the procedures to remove them had a very high failure rate and/or needed to be performed repeatedly; Thus:

j. That the Artisyn Mesh was manufactured negligently;

k. That the Artisyn Mesh was manufactured defectively; and

l. That the Artisyn Mesh was designed negligently and designed defectively.

63. Defendants were under a duty to disclose to Plaintiff and Plaintiff's physicians, the defective nature of the Artisyn Mesh, including, but not limited to, the heightened risks of erosion, failure and permanent injury.

64. Defendants had sole access to material facts concerning the defective nature of the Artisyn Mesh and their propensity to cause serious and dangerous side effects and hence, cause dangerous

injuries and damage to persons who used the Artisyn Mesh.

65.    Defendants' concealment and omissions of material fact concerning the safety of the Artisyn Mesh were made to cause the Plaintiff, the Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Artisyn Mesh; and/or to mislead Plaintiff and Plaintiff's physicians into reliance and cause Plaintiff to have the Artisyn Mesh implanted into her body.

66.    At the time these representations were made by Defendants, and at the time Plaintiff used the Mesh Product, Plaintiff was unaware of the falsehood of these representations, and reasonably believed them to be true.

67.    Defendants knew and had reason to know that the Artisyn Mesh could and would cause severe and grievous personal injury to the users of the Artisyn Mesh, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

68.    In reliance upon these false representations, Plaintiff was induced to, and did use the Artisyn Mesh, thereby sustaining severe and permanent personal injuries and damages. Defendants knew or had reason to know that Plaintiff and Plaintiff's physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Artisyn Mesh, as described in detail herein.

69.    As a result of Defendants' research and testing or lack thereof, Defendants distributed false information, including but not limited to assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Artisyn Mesh were safe for use as a means of providing relief from stress urinary incontinence and/or prolapse and were as safe or safer than other products and/or procedures available and on the market. Further, Defendants misrepresented to the Plaintiff and to the Plaintiff's physicians that the Artisyn Mesh were more effective than

other means of treatment for these conditions for which they were implanted.

70.   As a result of Defendants' research and testing, or lack thereof, Defendants negligently communicated certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

71.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

72.   The information distributed to the public, the medical community, the FDA, and Plaintiff by Defendants included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Artisyn Mesh.

73.   Defendants negligently made material misrepresentations to the medical community and public, including Plaintiff Charlotte Salinero, regarding the safety of the Artisyn Mesh specifically, that the Artisyn Mesh did not have dangerous and/or serious adverse health safety concerns, and that the Artisyn Mesh were as safe as other means of treating vaginal vault prolapse.

74.   Defendants negligently failed to inform the public, including Plaintiff, of the high failure rate including erosion, the difficulty of removing the mesh, and the risk of permanent injury. Defendants chose to over-promote the safety, efficacy and benefits of the Artisyn Mesh instead.

75.   Defendants' intent and purpose in making these false communications was to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure them of the quality and fitness for use of the Artisyn Mesh; and induce Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Artisyn Mesh.

76.    Upon information and belief, Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and to healthcare professionals and in advertisements that the Artisyn Mesh did not present serious health risks.

77.    These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

78.    These representations, and others made by Defendants, were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiff, and Plaintiff's healthcare professionals, to rely on misrepresentations, and caused Plaintiff to purchase, rely, use, and request the Artisyn Mesh, and caused her healthcare professionals to dispense, recommend, or prescribe the Artisyn Mesh.

79.    Defendants recklessly and/or falsely represented the dangerous and serious health and safety concerns inherent in the use of the Artisyn Mesh to the public at large, for the purpose of influencing the sales of Artisyn Mesh known to be dangerous and defective, and/or not as safe as other alternatives. Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Artisyn Mesh. At the time the representations were made, Plaintiff and Plaintiff's healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Artisyn Mesh. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

80.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Artisyn Mesh, Plaintiff would not have purchased, used, or relied on Defendants' Artisyn

20

Mesh.

81.  At all times relevant herein, the Artisyn Mesh were widely advertised and promoted by the Defendants as a safe and effective treatment for vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse. Defendants minimized the risks posed to vaginal prolapse patients with implantation of the Artisyn Mesh.

82.  At all times relevant to this action, Defendants knew that the Artisyn Mesh was not safe for the patients for whom they were prescribed and implanted, because the mesh eroded and otherwise malfunctioned, and therefore failed to operate in a safe and continuous manner, causing injuries including, but not limited to, erosion, extrusion, infection, sepsis, chronic foreign body invasion, dense adhesions and worsening dyspareunia. Removal of eroded or infected mesh brings a high rate of life-threatening complications including permanent disfigurement and hemorrhage. Removal can require multiple surgical interventions in the operating theater for complete removal and results in scarring on fragile compromised pelvic tissue and muscles.

83.  Defendants failed to design and establish a safe, effective procedure for removal of the Products, or to determine if a safe, effective procedure for removal of the products exists.

84.  At all relevant times herein, Defendants continued to promote Artisyn Mesh as safe and effective even when no clinical trials had been done supporting long or short-term efficacy. In doing so the Defendants concealed the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Artisyn Mesh for treatment of vaginal vault prolapse.

85.  At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiffs and the general public on notice of the dangers and adverse effects caused by implantation of the Artisyn Mesh system including, but not limited to, mesh erosion, dense adhesions, worsening dyspareunia, chronic pain, infection, sepsis, permanent

disfigurement and multiple surgeries for mesh removal.

86. The Artisyn Mesh as designed, manufactured, distributed sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of pelvic health safety.

87. At all times herein mentioned, the employees, agents, officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned Artisyn Mesh when they knew of the hazards and dangerous propensities of said Artisyn Mesh, and thereby actively participated in the tortuous conduct that resulted in the injuries suffered by Plaintiffs.

<u>**COUNT I: NEGLIGENCE**</u>

88. Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Amended Complaint as if fully set forth herein, and further alleges the following:

89. Defendants had a duty to individuals, including Plaintiffs, to exercise reasonable and ordinary care in the manufacture, design, labeling, packaging, testing, instruction, warning, selling, marketing, and distribution, related to its Artisyn Mesh.

90. Defendants breached their duty of care and were negligent as described herein in the design, manufacture, labeling, warning, selling, marketing, and distribution of the Artisyn Mesh in one or more of the following respects:

      a. Failing to design the Artisyn Mesh so as to avoid an unreasonable risk of harm to Plaintiff;

      b. Failing to manufacture the Artisyn Mesh so as to avoid an unreasonable risk of harm to Plaintiff;

      c. Failing to use reasonable care in the testing of the Artisyn Mesh so as to avoid an unreasonable risk of harm to Plaintiff;

d. Failing to use reasonable care in inspecting the Artisyn Mesh so as to avoid unreasonable risk of harm to Plaintiff;

e. Failing to use reasonable care in training its employees and health care providers related to the use of the Artisyn Mesh so as to avoid unreasonable risk of harm to Plaintiff;

f. Failing to use reasonable care in instructing and/or warning health care providers, the FDA and the public as set forth herein of risks associated with the Artisyn Mesh, so as to avoid unreasonable risk of harm to Plaintiff;

g. Failing to use reasonable care in marketing and promoting the Products, so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

h. Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling, studying, testing or selling the Artisyn Mesh, and;

i. Failing to use reasonable care in seeking and obtaining proper FDA clearance prior to marketing and selling the device for implantation into the human body.

91. Failed to conduct post-market vigilance, or surveillance, by:

a. Monitoring or acting on findings in the scientific and medical literature; and

b. Monitoring or investigating and evaluating reports in the FDA adverse event databases for their potential significance for Defendants' Artisyn Mesh.

c. Failed to comply with manufacturer requirements of the Medical Device Reporting (MDR) Regulations, specifically.

d. Failed to report MDRs (Medical Device [adverse event] Reports); and

e. Failed to investigate reports of serious adverse events.

92. As a direct and proximate result of Defendants' negligence, Plaintiffs have sustained

catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on the aforementioned Count for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT II: <u>STRICT LIABILITY – MANUFACTURING DEFECT</u>

93.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Amended Complaint as if fully set forth herein, and further alleges the following:

94.    The Mesh Product implanted in Plaintiff was not reasonably safe for its intended use and was defective with respect to its manufacture, as described herein, in that Defendants deviated materially from their design and manufacturing specifications and/or such design and manufacture posed an unreasonable risk of harm to Plaintiff in whom the Artisyn Mesh were implanted.

95.    The Defendants' Artisyn Mesh are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers.

96.    The Artisyn Mesh creates risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions, and which far outweigh the utility of the Artisyn Mesh.

97.    Defendants have negligently and recklessly manufactured the Artisyn Mesh with wanton and willful disregard for the rights and health of the Plaintiff and others, and with malice, placing their economic interests above the health and safety of the Plaintiff.

24

98.     As a direct and proximate result of Defendants' manufacturing defect, Plaintiffs have sustained catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

99.     The Defendants are strictly liable in tort to the Plaintiffs for their wrongful conduct.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT III: <u>STRICT LIABILITY – FAILURE TO WARN</u>

100.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein, and further alleges the following:

101.    The Defendants failed to properly and adequately warn and instruct the Plaintiff and the health care providers as to the proper candidates, and the safest and most effective methods of implantation and use of the Defendants' Artisyn Mesh.

102.    The Defendants failed to properly and adequately warn and instruct Plaintiff and the health care providers as to the risks and benefits of the Defendants' Artisyn Mesh, given the Plaintiff's conditions and need for information.

103.    The Defendants failed to properly and adequately warn and instruct the Plaintiff and the health care providers with regard to the inadequate research and testing of the Artisyn Mesh, and the complete lack of a safe, effective procedure for removal of the Artisyn Mesh.

104.    In addition, the Artisyn Mesh was defective due to the lack of necessary and appropriate warnings regarding, but not limited to, the following:

a.  the Artisyn Mesh's propensities to contract, retract, and/or shrink inside the body;

b.  the Artisyn Mesh's propensities for degradation, fragmentation, disintegration and/or creep;

c.  the Artisyn Mesh's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.  the rate and manner of mesh erosion or extrusion;

e.  the risk of chronic inflammation resulting from the Artisyn Mesh;

f.  the risk of chronic infections resulting from the Artisyn Mesh;

g.  the risk of permanent vaginal or pelvic scarring as a result of the Artisyn Mesh;

h.  the risk of recurrent, intractable pelvic pain and other pain resulting from the Artisyn Mesh;

i.  the need for corrective or revision surgery to adjust or remove the Artisyn Mesh;

j.  the severity of complications that could arise as a result of implantation of the Artisyn Mesh;

k.  the hazards associated with the Artisyn Mesh;

l.  the Artisyn Mesh's defects described herein;

m.  treatment of pelvic organ prolapse and stress urinary incontinence with the Artisyn Mesh is no more effective than feasible available alternatives;

n.  treatment of pelvic organ prolapse and stress urinary incontinence with the Artisyn Mesh exposes patients to greater risk than feasible available alternatives;

o.  treatment of pelvic organ prolapse and stress urinary incontinence with the Artisyn Mesh makes future surgical repair more difficult than feasible available alternatives;

p.  use of the Artisyn Mesh puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q. removal of the Artisyn Mesh due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r. complete removal of the Artisyn Mesh may not be possible and may not result in complete resolution of the complications, including pain.

105. The Defendants negligently, recklessly, and maliciously misrepresented the safety, risks, and benefits of the Defendants' Artisyn Mesh, understating the risks and exaggerating the benefits in order to advance their own financial interests, with wanton and willful disregard for the rights and health of the Plaintiff.

106. As a direct and proximate result of Defendants' failure to warn, Plaintiffs have sustained catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

107. The Defendants are strictly liable in tort to the Plaintiffs for their wrongful conduct.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT IV: STRICT LIABILITY – DESIGN DEFECT

108. Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein, and further alleges the following:

109. The Artisyn Mesh implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein with respect to its design. As previously stated, the Artisyn Mesh's design defects include, but are not limited to:

27

a. the use of polypropylene material and/or collagen material and the immune reaction that results from such material, causing adverse reactions and injuries;

b. the design of the Artisyn Mesh to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. biomechanical issues with the design of the Artisyn Mesh, including, but not limited to, the propensity of the Artisyn Mesh to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e. the propensity of the Artisyn Mesh for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f. the inelasticity of the Artisyn Mesh, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g. the propensity of the Artisyn Mesh for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. the propensity of the Artisyn Mesh for particle loss or "shedding", which causes a chronic inflammatory response and fibrotic reaction, and results in continuing injury over time; the lack of porosity of the Artisyn Mesh, which leads to fibrotic bridging

and results in continuing injury over time; and

    i.  the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

110.    As a direct and proximate result of Defendants' design defect, Plaintiffs have sustained catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

111.    Defendants are strictly liable to Plaintiff for designing a defective product.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT V: <u>FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS</u>

112.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein, and further alleges the following:

113.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public, that the Artisyn Mesh had not been adequately tested and found to be safe and effective for the treatment of prolapse.

114.    The representations made by Defendants, in fact, were false.

115.    When Defendants made their representations, Defendants knew and/or had reason to know that those representations were false, and Defendants negligently disregarded the

inaccuracies in their representations and the dangers and health risks to users of the Artisyn Mesh.

116.    These representations were made by Defendants in the regular course of business for the purpose of misleading the medical community, Plaintiffs, and the public, to prescribe, dispense, and/or purchase the Artisyn Mesh for use as a means of treatment for prolapse.

117.    In representations to Plaintiff and/or to Plaintiff's healthcare providers, Defendants negligently communicated the following information:

      a.  That the Defendants' Artisyn Mesh was as safe as other products and procedures available to treat prolapse;

      b.  That the Defendants' Artisyn Mesh was more effective than other products and procedures available to treat prolapse;

      c.  The Defendants' Artisyn Mesh was adequately tested;

      d.  That the limited clinical testing revealed the Defendants' Artisyn Mesh had a lower risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat prolapse;

      e.  That Defendants followed up on the adverse results from clinical studies and formal and informal reports from physicians and other healthcare providers;

      f.  That Defendants were aware of dangers with the Defendants' Artisyn Mesh in addition to and above and beyond those associated with other products and procedures available to treat incontinence prolapse;

      g.  That the Defendants' Artisyn Mesh was defective, and that they caused dangerous and adverse side effects, including but not limited to higher incidence of erosion and failure, at a much more significant rate than other products and procedures available to treat prolapse;

118.    Defendants were under a duty to disclose to Plaintiff and physicians, the defective

nature of the Defendants' Mesh Products, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

119.    The Plaintiff and/or Plaintiff's Physicians are people for whose benefit and guidance Defendants intended to supply false information to for the monetary benefit of the Defendants.

120.    The false information Defendants provided Plaintiff and her medical providers regarding the safety of the Artisyn Mesh were made to cause physicians and healthcare providers to purchase, prescribe, and/or dispense the Artisyn Mesh; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Defendants' Artisyn Mesh.

121.    At the time these representations were made by Defendants, and at the time Plaintiff used the Artisyn Mesh, Plaintiff was unaware of the falsehood of these representations, and reasonably believed them to be true.

122.    Defendants knew and had reason to know that the Defendants' Artisyn Mesh could and would cause severe and grievous personal injury to the users, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

123.    In reliance upon these false representations, Plaintiffs were induced to, and did use the Artisyn Mesh, thereby sustaining severe and permanent personal injuries and damages. Defendants knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendants' false communications.

124.    Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the United States Food and Drug Administration ("FDA").

125.    The information distributed to the public, the medical community, the FDA, and Plaintiff, by Defendants included, but was not limited to websites, information presented at medical

and professional meetings, information disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading regarding the dangers of the use of the Defendants' Artisyn Mesh.

126.   Defendants breached their duty in representing that the Defendants' Artisyn Mesh had no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff's physicians, and the medical and healthcare community.

127.   Defendants knew or should have known, that the Artisyn Mesh had been insufficiently tested, or had not been tested at all, and that it lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, erosion, pain and suffering, surgery to remove the products, and other severe and personal injuries, which are permanent and lasting in nature.

128.   As a direct and proximate result of Defendants' false information negligently supplied for the guidance of the Plaintiff and/or her physicians, Plaintiff sustained catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT VI: <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

129.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein, and further alleges the following:

130.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' Artisyn Mesh to Plaintiff, carelessly and negligently concealing the harmful effects of the Defendants' Artisyn Mesh from Plaintiff, and carelessly and negligently misrepresented the quality, safety and efficacy of the products.

131.    Plaintiffs were directly impacted by Defendants' carelessness and negligence, in that Plaintiffs have sustained and will continue to sustain emotional distress, severe physical injuries and economic losses, and other damages as a direct result of the decision to purchase the Artisyn Mesh sold and distributed by Defendants.

132.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained catastrophic and permanent damages, including but not limited to, a urinary-genital tract fistulae, severe and permanent pain, gas and stool in vagina, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

### COUNT VII: <u>GROSS NEGLIGENCE</u>

133.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein, and further alleges the following:

134.    The wrongs done by Defendants were aggravated by the grossly negligent disregard for the rights of others, the public, and Plaintiffs for which the law would allow, and which Plaintiffs

that Defendants' conduct, including the failure to comply with applicable Federal standards: was specifically intended to cause substantial injury to Plaintiffs; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiffs.

135.    Plaintiffs relied on the representation and suffered injury as a proximate result of this reliance. Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

136.    Plaintiffs also allege that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiffs. In that regard, Plaintiffs will seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT VIII: <u>LOSS OF CONSORTIUM</u>

137.    Plaintiffs adopt, reallege and incorporate by reference paragraphs 1-136 of this Complaint as if fully set forth herein, and further alleges the following:

138.    At all relevant times hereto, Plaintiff's spouse, Efrain Salinero, has suffered injuries and

34

losses as a result of Plaintiff's injuries.

139.    For the reasons set forth herein, Plaintiff's spouse, Efrain Salinero, has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

140.    For the reasons set forth herein, Plaintiff's spouse, Efrain Salinero, has suffered and will continue to suffer the loss of his loved one's support, companionship, services, society, love and affection.

141.    Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

142.    Plaintiff's spouse, Efrain Salinero, has suffered great emotional pain and mental anguish.

143.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's spouse, Efrain Salinero, has sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

144.    Defendants are liable to Plaintiff's spouse, Efrain Salinero, for all general, special and equitable relief to which Plaintiff's spouse, Efrain Salinero, is entitled by law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT IX: <u>PUNITIVE DAMAGES</u>

145.    Plaintiffs incorporate by reference paragraphs 1-136 of this Complaint as if fully set

forth herein.

146.    Defendants sold Artisyn Mesh to Plaintiff's healthcare providers and other healthcare providers throughout the United States without doing adequate testing to ensure that the meshes were reasonably safe for implantation in the female pelvic area.

147.    Defendants sold the Artisyn Mesh to Plaintiff's health care providers and other health care providers throughout the United States in spite of their knowledge that the Artisyn Mesh can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Amended Complaint, thereby causing severe and debilitating injuries suffered by the Plaintiffs.

148.    At all times relevant hereto, Defendants knew or should have known that the Defendants' Artisyn Mesh were inherently dangerous with respect to the risks of erosion, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

149.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the Defendants' Artisyn Mesh.

150.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the Defendants' Artisyn Mesh.

151.    At all times material hereto, Defendants negligently and recklessly disregarded the fact that the Defendants' Artisyn Mesh cause debilitating and potentially lethal side effects with greater frequency than safer alternative methods products and/or procedures and/or treatment.

152.    At all times material hereto, Defendants knew and/or recklessly disregarded the fact that the Defendants' Artisyn Mesh cause debilitating and potentially lethal side effects with greater

frequency than safer alternative products and/or methods of treatment and recklessly failed to advise healthcare providers, the public and the FDA of same.

153. At all times material hereto, Defendants negligently misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the Defendants' Artisyn Mesh.

154. Notwithstanding the foregoing, Defendants continue to aggressively market the Defendants' Artisyn Mesh to consumers, without disclosing the true risk of side effects and complications.

155. Defendants knew of the Defendants' Artisyn Mesh defective and unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the Defendants' Artisyn Mesh so as to maximize sales and profits at the expense of the health and safety of the Public, including Plaintiff, in conscious and/or reckless disregard of the foreseeable harm caused by the Defendants' Artisyn Mesh.

156. Defendants continue to conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiff, the serious side effects of the Defendants' Artisyn Mesh in order to ensure continued and increased sales.

157. Defendants' reckless and/or grossly negligent failure to disclose information deprived Plaintiff of necessary information to enable them to weigh the true risks of using the Defendants' Artisyn Mesh against their benefits.

158. As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and have incurred medical, health care, incidental, and related expenses. Plaintiffs are informed and believe and further allege that Plaintiff will in the future be required to obtain further medical care and/or hospital care and medical services.

159. Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages.

160. Defendants' conduct as described herein shows negligent misconduct, wantonness, oppression, and/or a gross disregard for the safety of the Plaintiff and other similarly situated, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## COUNT X: <u>DISCOVERY RULE AND TOLLING</u>

161. Plaintiffs incorporate by reference paragraphs 1-160 of this Complaint as if fully set forth herein.

162. Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, and discovery rule.

163. Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

164. Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages, and the relationship to the Artisyn Mesh was not discovered, and through reasonable care and due diligence could not have been discovered, until approximately March or April 2017, a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate

application of the discovery rule, Plaintiffs' suit is being filed well within the applicable statutory limitations period.

165.    The running of the statute of limitations in this cause is tolled due to equitable tolling. Defendant(s) are estopped from asserting a statute of limitations defense due to Defendants' negligent communication of false statements and omissions, to Plaintiff and Plaintiff's physicians of the true risks associated with the Artisyn Mesh.

166.    As a result of Defendants' actions, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant(s).

## **PRAYER FOR RELIEF**

167.    WHEREFORE, Plaintiffs pray for judgment against the Defendants on all of the aforementioned counts for compensatory and punitive damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled as well as:

a.  Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

b.  Reasonable attorneys' fees;

c.  All ascertainable economic damages;

d.  Punitive damages; and

**Dated: October 23, 2018**

THE FERRARO LAW FIRM, P.A.
*Attorneys for Plaintiffs*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

/s/ *Gabriel S. Saade*

_____

GABRIEL S. SAADE, ESQ.
Florida Bar No.: 111742
JAMES L. FERRARO, JR., ESQ.
Florida Bar No.: 107494